DAVID CARPENTER's (dependent's) CASE.

Suffolk. January 4, 2010. - March 31, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Workers' Compensation Act,* Claim, Decision of Industrial Accident Review-
ing Board, Prima facie evidence, Findings by administrative judge, Expert
opinion, Injuries to which act applies, Presumptions and burden of proof.
*Statute,* Construction.

The reviewing board of the Department of Industrial Accidents properly af-
firmed an administrative judge's application of G. L. c. 152, § 7A, on the
issue of the causal link between an employee's death and his employment,
where the insurer had not brought forward evidence sufficient to overcome
the prima facie evidentiary effect of that statute, and where the judge's
findings that the employee's work activities were a major contributing fac-
tor in his sudden death at his place of employment were consistent with
and supported by medical evidence in the record. [439-445]

This court concluded that in a worker's compensation case, in circumstances
where a noncompensable preexisting condition combines with a compen-
sable injury and results in a workplace death, application of the "combina-
tion injury" defense pursuant to G. L. c. 152, § 1(7A), alters the insurer's
burden of production in rebutting the prima facie evidentiary effect of
G. L. c. 152, § 7A, such that the insurer must produce evidence that a non-
compensable preexisting condition existed at the time of the employee's
death, together with appropriate medical expert evidence on the issue of
causation, to establish that the employee's death was caused solely by the
preexisting condition; or, where the insurer does not argue that the death
resulted solely from the noncompensable preexisting condition, the insurer
must submit appropriate medical evidence that the compensable part of the
combination injury was not a major cause of death. [445-449]

The reviewing board of the Department of Industrial Accidents, although
incorrectly concluding that the "combination injury" defense pursuant to
G. L. c. 152, § 1(7A), and the prima facie evidentiary effect of G. L.
c. 152, § 7A, were mutually exclusive, nonetheless properly affirmed an
administrative judge's decision awarding burial expenses and survivor
benefits to an employee's widow, where the judge's extensive factual find-
ings, supplemented with uncontested evidence from the record, provided
the necessary factual predicate to support his conclusions, including his
rejection of the insurer's combination injury defense. [449]

APPEAL from a decision of the Industrial Accident Reviewing
Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John J. Canniff* (*John F. Keefe* with him) for the insurer.

*Peter T. Toland* for the claimant.

*Paul M. Moretti & Scott K. Lueker*, for Property Casualty Insurers' Association of America, amicus curiae, submitted a brief.

IRELAND, J. David Carpenter (employee), a custodian at an elementary school in the city of Woburn (employer), died at the age of fifty-two while at work and after operating a heavy, commercial snow blower. He experienced "sudden cardiac death" (SCD) due to ventricular arrhythmia.[1] The employer's workers' compensation insurer, MIIA Workers' Compensation SIG (insurer), appeals from a decision of the reviewing board of the Department of Industrial Accidents (board) affirming a decision of an administrative judge awarding burial expenses under G. L. c. 152, § 33, and survivor benefits under G. L. c. 152, § 31, to the employee's widow. The insurer argues that the board incorrectly applied G. L. c. 152, § 7A (§ 7A),[2] to the facts of this case; the board erroneously declined to consider the insurer's defense

---

[1]There was expert medical evidence defining sudden cardiac death (SCD) as "the natural death from cardiac causes that is heralded by the abrupt loss of consciousness within one hour of the onset of symptoms in individuals with or without known pre-existing heart disease, but in who the time and mode of death are unexpected." Although the risk of SCD is highest in individuals with coronary artery disease (CAD), more than eighty per cent of the incidence of SCD occurs in asymptomatic individuals who have no prior history of CAD and who do not experience a myocardial infarction (heart attack). About eighty per cent of SCDs occur in "nonexertional circumstances." A person with ventricular arrhythmia has an irregular heart rhythm caused by abnormal electrical impulses in the ventricles of the heart.

[2]General Laws c. 152, § 7A (§ 7A), provides:

> "In any claim for compensation where the employee has been killed or found dead at his place of employment or, in the absence of death, is physically or mentally unable to testify, and such testimonial incapacity is causally related to the injury, it shall be prima facie evidence that the employee was performing his regular duties on the day of the injury or death and that the claim comes within the provisions of this chapter, that sufficient notice of the injury has been given and that the injury or death was not occasioned by the willful intention of the employee to injure or kill himself or another."

pursuant to G. L. c. 152, § 1 (7A) (§ 1 [7A]),[3] concerning the effect of the employee's preexisting coronary artery disease (CAD) on the element of causation; and the administrative judge erroneously applied § 1 (7A). We transferred the case from the Appeals Court, see G. L. c. 152, § 12 (2), on our own motion. We reject these arguments and affirm the board's decision, as modified herein.

1. *Background.* We summarize the facts found by the administrative judge and adopted by the board.[4] On Monday, January 24, 2005, the employee was working with a coworker clearing a large amount of heavy snow from school grounds. It had snowed over the course of the weekend, leaving an accumulation of two feet of snow, and as a result, the school was closed. After arriving at work at about 7:00 A.M., the employee spent the morning operating a large, commercial-model snow blower, shoveling a tall snow drift with his coworker, and replacing a broken cotter pin on the snow blower. Although the snow blower was self-propelling, it weighed about 200 pounds and had to be manually maneuvered from side to side and around sharp corners.

At 12:15 P.M., the employee went to lunch with his wife. During lunch, he did not voice any complaints or indicate that he was not feeling well. He returned to work at approximately 1:30 P.M.. At the time, it was cold outside, with temperatures ranging between nineteen and thirty-three degrees Fahrenheit.

The employee resumed operating the snow blower to improve the paths he had completed before lunch. His coworker heard the motor of the snow blower running continuously and, at approximately 1:50 P.M., went to check on the employee. He found the employee motionless, leaning against a snow drift "higher than a man" beside the snow blower. Emergency medical person-

---

[3]The fourth sentence of G. L. c. 152, § 1 (7A) (§ 1 [7A]), provides, in relevant part: "If a compensable injury or disease combines with a preexisting [non-compensable condition] to cause or prolong disability or a need for treatment, the resultant condition shall be compensable only to the extent such compensable injury or disease remains a major but not necessarily predominant cause of disability or need for treatment." We shall refer to this particular provision as the defense under § 1 (7A) or the "combination injury" defense, see *Cornetta's Case*, 68 Mass. App. Ct. 107, 117 (2007).

[4]We occasionally supplement the facts with uncontested evidence from the hearing the administrative judge conducted. See *Sikorski's Case*, 455 Mass. 477, 478 (2009).

nel were summonsed and determined on arrival that the employee had no pulse. By ambulance, the employee was transported to a nearby hospital, where he was pronounced dead. The employee had experienced SCD.

2. *Standard of review.* An aggrieved party may seek judicial review of a decision of the board concerning workers' compensation benefits. G. L. c. 152, § 12 (2). As specified in G. L. c. 152, § 12 (2), we review the board's decision in accordance with the standards set forth in G. L. c. 30A, § 14 (7) (*a*)-(*d*), (*f*), and (*g*). *Scheffler's Case*, 419 Mass. 251, 257-258 (1994). Pursuant to these statutory standards, we may reverse or modify the board's decision when it is "[i]n violation of constitutional provisions," "[i]n excess of the statutory authority or jurisdiction of the agency," "[b]ased upon an error of law," "[m]ade upon unlawful procedure," "[u]nwarranted by facts found . . . where the court is constitutionally required to make independent findings of fact," or is "[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." G. L. c. 30A, § 14 (7) (*a*)-(*d*), (*f*), and (*g*). Under these standards, in determining whether the board properly affirmed the administrative judge's findings, we consider "whether the decision is factually warranted and not '[a]rbitrary or capricious,' in the sense of having adequate evidentiary and factual support and disclosing reasoned decision making." *Scheffler's Case*, *supra* at 258. See *Robinson's Case*, 416 Mass. 454, 457 (1993) (standards identified in G. L. c. 152, § 12 [2], "may overlap with the substantial evidence standard"). Where a statute is involved, "[a]lthough '[t]he interpretation of a statute by the agency charged with primary responsibility for administering it is entitled to substantial deference,' *Gateley's Case*, 415 Mass. 397, 399 (1993), ultimately the 'duty of statutory interpretation is for the courts.' *Slater's Case*, 55 Mass. App. Ct. 326, 330 (2002)." *Moss's Case*, 451 Mass. 704, 709 (2008).

3. *Discussion.* a. *Application of § 7A.* The insurer asserts that the employee's SCD was inevitable and its occurrence at work was coincidental. Consequently, the insurer states that the board erred in affirming the administrative judge's decision, arguing that he improperly applied § 7A on the issue of the causal link between employment and death. In support of this argument, the insurer contends that the administrative judge's decision

reflects a misunderstanding of the medical evidence. We reject these arguments.

In *Moss's Case, supra* at 707-708, we provided a comprehensive overview of § 7A, see note 2, *supra*:

> "Section 7A is designed to '[t]o aid the victim[] of an unwitnessed accident' who is unable to testify and therefore has difficulty meeting the burden of proving entitlement to compensation under G. L. c. 152. L.Y. Nason, C.W. Koziol, & R.A. Wall, Workers' Compensation § 17.4 (3d ed. 2003). See *id.* at § 10.11. The section by its terms establishes prima facie evidence of four separate aspects of a workers' compensation claim: (1) 'that the employee was performing his regular duties on the day of injury or death'; (2) 'that the claim comes within the provisions of [c. 152]'; (3) 'that sufficient notice of the injury has been given'; and (4) 'that the injury or death was not occasioned by the willful intention of the employee to injure or kill himself or another.' G. L. c. 152, § 7A. In *Anderson's Case,* [373 Mass. 813 (1977)], this court held that particularly the second of these, 'the claim comes within the provisions of [c. 152],' reflected a legislative intent that where an employee was found dead at his job, this fact should establish prima facie evidence that the employee's death was causally related to his employment. The court stated:
>
>> 'For a claim to be compensable it must arise out of and in the course of employment. Clearly a causal relationship is required between the employment duties and the injury or death. In a case such as this one, where the employee was found dead at his place of employment, we construe the statute, § 7A, as establishing, inter alia, prima facie evidence of causal relationship between the employment and the injury or fatality. We believe that was the meaning intended by the Legislature, particularly in its use of the words, "and that the claim comes within the provisions of this chapter." *Anderson's Case,* [*supra*] at 816-817.' "[5]

An insurer may overcome the prima facie evidentiary effect

[5]In *Moss's Case,* 451 Mass. 704, 710 (2008), we stated that, while § 7A establishes prima facie evidence of the facts set out in that section, it does not

of § 7A by assuming the burden of production. In *Anderson's Case*, *supra* at 817, we explained:

> "Prima facie evidence, in the absence of contradictory evidence, requires a finding that the evidence is true; the prima facie evidence may be met and overcome by evidence sufficient to warrant a contrary conclusion; even in the presence of contradictory evidence, however, the prima facie evidence is sufficient to sustain the proposition to which it is applicable."

If an insurer produces "evidence sufficient to warrant a contrary conclusion," *id.*, on a fact set out in § 7A, a question of fact arises for an administrative judge to decide, and the judge must weigh the evidence and make credibility determinations in reaching a conclusion. Such credibility determinations are within the sole province of an administrative judge and are to be considered final by both the reviewing board and an appellate court. *Lettich's Case*, 403 Mass. 389, 394 (1988). See *Pilon's Case*, 69 Mass. App. Ct. 167, 169 (2007) ("Findings of fact, assessments of credibility, and determinations of the weight to be given the evidence are the exclusive function of the administrative judge"). Where, as here, "causal relation is a matter beyond the common knowledge and experience of the ordinary layman, the proof must rest upon expert medical testimony." *Buck's Case*, 342 Mass. 766, 769 (1961). "The probative value of this testimony is to be weighed by the fact-finding tribunal." *Fitzgibbons's Case*, 374 Mass. 633, 635 (1978).

Before addressing the insurer's arguments, we summarize the findings and conclusions of the administrative judge, as well as the conclusions drawn by the board. The administrative judge first determined that the employee was in the course of his employment when he suffered SCD and that, consequently, the prima facie evidentiary effect of § 7A applied. He credited the findings of the limited autopsy conducted of the employee's heart. The autopsy indicated that the employee was suffering from an occlusion (narrowing) of over ninety per cent of the left anterior descending coronary artery. It also revealed that the

establish prima facie evidence "of every fact necessary to establish entitlement to compensation under every section of c. 152 that deals with compensation, including the double compensation provided under [G. L. c. 152,] § 28."

employee had "patchy subendocardial fibrosis [scarring of the heart] but no evidence of substantial old myocardial infarction [heart attack] and no evidence of acute injury."

The administrative judge adopted the conclusion, reached both by one of the employee's medical experts, Dr. Richard D. Patten, and by the insurer's medical expert, Dr. Milo F. Pulde, that the employee's SCD resulted from ventricular arrhythmia, see note 1, *supra.* As to the insurer's defense under § 1 (7A) concerning the effect of the employee's preexisting coronary artery disease, the administrative judge adopted Dr. Pulde's (insurer's expert) opinion that the employee did, in fact, suffer from a preexisting condition. Specifically, Dr. Pulde gave the opinion that, prior to his death, the employee suffered "with severe multivessel coronary disease with critical ninety-five per cent obstruction of the major left anterior descending artery . . . and less critical disease of the remaining arteries." Dr. Pulde's opinion was based on the records of the employee's primary care physician (PCP), Dr. Arthur S. Kress, which indicated that the employee suffered, on January 4, 2005, from unstable angina[6]; and the autopsy finding of fibrosis, which, to Dr. Pulde, indicated that the employee had a severely diseased "coronary anatomy prior to [the date of death] that was causing damage to the heart muscle and that damage was identified at pathology as fibrosis or scarring." The administrative judge credited Dr. Pulde's opinion that the employee's preexisting conditions "were medically consistent with severe non-work related multivessel coronary disease and unstable angina 'that culminated in either ischemia-related [loss of sufficient blood flow to the heart] polymorphic ventricular tachycardia or substrate (subendeocardial fibrosis) [diseased, scarred heart muscle] related monomorphic ventricular tachycardia

---

[6]The employee was five feet, ten inches tall, and weighed 179 pounds. He exercised regularly and was considered to be in good physical condition. The judge found that the employee went to Dr. Kress on January 4, 2005, complaining of upper back and shoulder pain. Dr. Kress conducted an electrocardiogram that was within normal limits. Dr. Kress noted that the employee had several cardiac risk factors, including an elevated cholesterol level that was being treated successfully with medication; a family history of CAD; and a past history of smoking. Dr. Kress scheduled an exercise treadmill test after seeing the employee (it had been scheduled sometime prior to January 24, 2005), but the employee canceled the appointment.

. . . that degenerated [on January 24, 2005,] into ventricular fibrillation and resulted in his biological death.' "[7]

The administrative judge expressly credited the following testimony of Dr. Pulde, elicited during cross-examination, concerning the effect of physical exertion on the employee's biological death: "*[A]ny type of exertion*, whether one postulates that [the employee's death was] ischemia related or substrate related . . . would have precipitated [the employee's] sudden death and . . . his sudden death was likely to occur in any context [in] any type of physical activity and would have occurred independent of that work activity on January 24, 2005" (emphasis added). The administrative judge, however, expressly rejected Dr. Pulde's opinion that the employee's work activities on January 24, 2005, did *not* trigger the medical events that culminated in his SCD.[8] Instead, the administrative judge credited and adopted the opinion of Dr. Kress, stating: "[Dr. Kress], while recognizing that his patient suffered from several cardiac risk factors along with pre-existing cardiac conditions, offered his 'medical opinion that the work that [the employee] was doing on the day in question was a major contributing factor in his death.' "[9],[10]

The administrative judge concluded that "the insurer has not

---

[7]Polymorphic and monomorphic ventricular tachycardia refer to fast heart rhythms arising in the ventricles of the heart. Stedman's Medical Dictionary 979, 1235, 1550 (25th ed. 1990). These rhythms may deteriorate into ventricular fibrillation, which is defined as "fine, rapid, fibrillary movements of the ventricular muscle that replace the normal contraction," *id.* at 580-581, and which, if not corrected with emergency treatment, results in death within a few minutes.

[8]Dr. Pulde explained that "the activity [the employee] performed [on] January 24, 2005, certainly can induce ischemia, but . . . it was not an inordinate or excessive amount of physical activity that was disproportionate to any other type of activity done in the work environment, and therefore it should not be considered a trigger based on our definitions of what represents triggers."

[9]Dr. Patten reached the same conclusion.

[10]Dr. Pulde's opinion on the issue of work-related exertion was contrary to that of Dr. Kress and Dr. Patten. Dr. Kress's opinion took into account that the employee had been engaged in "heavy exertion" just before his death. While Dr. Patten opined that the employee's physical activity on January 24, 2005, was a major contributing factor in his death, his opinion was based on the fact that the employee had engaged in "a significant level" of "strenuous physical activity." While the record certainly would have supported a finding that on

brought forward convincing evidence sufficient to overcome the prima facie presumptions afforded by § 7A." He found that the employee suffered SCD arising out of and while in the course of his employment, and that the employee's work activities on January 24, 2005, were "a major contributing cause of his sudden cardiac arrest and resulting death." The administrative judge further concluded that the insurer's defense under § 1 (7A) lacked merit.

The board concluded that the administrative judge "properly determined that § 7A applied to this case." Concerning the administrative judge's conclusion that Dr. Pulde's opinion did not overcome the prima facie evidentiary effect of § 7A, the board determined that this conclusion was supported by the record and was "consistent with § 7A's application." Additionally, the board decided that the administrative judge's findings provided the necessary factual predicate to support his adoption of Dr. Kress's opinion.

Here, the insurer essentially asserts that once the administrative judge adopted some of Dr. Pulde's opinions, it was inconsistent and erroneous not to apply them all, specifically, Dr. Pulde's opinion that the employee's work on January 24, 2005, had no causal relation to his death. Although the insurer did produce evidence, through Dr. Pulde's testimony, in an attempt to overcome the prima facie evidentiary effect of § 7A (and offered Dr. Pulde's opinion in support of its defense under § 1 [7A]), the administrative judge was not required to credit *all* of Dr. Pulde's testimony, particularly when, as relevant to the issue whether the employee's death was work-related, there existed contrary evidence, namely Dr. Kress's opinion, which the administrative judge was entitled to credit.[11] See *Amon's Case*, 315 Mass. 210, 215 (1943).

---

January 24, 2005, the employee had engaged in heavy or strenuous physical exertion at work, on account of several factors including the weight of the snow blower and its occasional maneuvering from side to side, the weight of the snow, the amount of the snow, and the length of time devoted to snow removal, the judge did not make any specific finding characterizing the degree of exertion expended by the employee, instead finding that he had engaged in some exertion that, according to Dr. Pulde's testimony, was enough to trigger the medical events that resulted in his SCD (and enough, in the administrative judge's view, to be a major cause of the employee's death).

[11]The administrative judge implicitly rejected critical components of the basis of Dr. Pulde's opinion that the employee's death was not precipitated by

The insurer contends that the administrative judge's conclu-
sion cannot stand because Dr. Kress's opinion was predicated
on two facts that were not specifically found by the judge,
namely, heavy exertion and an extremely cold environment. We
point out, however, that as to the latter subject, the judge found
that the temperature at the time of the employee's death was
cold and ranged between nineteen and thirty-three degrees
Fahrenheit. Further, there was no need for the administrative
judge to make specific findings concerning the exact level of
physical exertion undertaken by the employee before his death
in view of the judge's acceptance of Dr. Pulde's opinion that
any level of exertion (and not necessarily heavy or significant
physical exertion as opined by Drs. Kress and Patten, see note
10, *supra*) could have precipitated SCD in the employee on ac-
count of the severity of his preexisting CAD (in the absence of
identifying and treating the disease). It was enough that this
employee, in his condition, had engaged in any degree of physi-
cal exertion at work, and this conclusion was supported by the
administrative judge's finding that, after lunch and within the
hour preceding his death, the employee had cleared "an ad-
ditional two to four feet of pathway" with the snow blower. The
result reached by the administrative judge is consistent with,
and supported by, the medical evidence in the record, and reflects
a correct application of § 7A.

b. *Application of defense under § 1 (7A)*. Although the admin-
istrative judge considered (and rejected) the insurer's defense
under § 1 (7A), the board concluded that, in cases where an
employee is found dead at the workplace, only § 7A applies
and the "combination injury" defense, see note 3, *supra*, under

---

work-related physical exertion. Dr. Pulde's opinion, in part, was based on the
absence of thrombus (the abrupt fracturing of coronary plaque, otherwise
known as a clot) in the employee, which is expected with physical exertion.
Dr. Patten, however, did not consider the description of the plaque in the
autopsy report to be adequate to say whether a thrombus had occurred. He
added that, depending on how an autopsy is conducted, a pathologist may not
even discover a clot. Moreover, Dr. Pulde's opinion was based also on the
employee's use of an "automated" snow blower, which in his view (based on
some scientific literature) could not generate a sufficient level of physical
exertion to trigger SCD. Dr. Patten questioned this opinion, explaining that
certain factors, such as the weight of the snow blower, and the amount and
weight of the snow subject to removal, were not taken into account. See note
10, *supra*.

§ 1 (7A) has no application. The board reasoned that § 7A and the defense under § 1 (7A) are mutually exclusive. The board based its conclusion on the absence of language in § 1 (7A) regarding workplace deaths. In addition, the board found the combination injury defense inapplicable because, in the case of a death, "no period of disability or a need for medical treatment occurs," as contemplated by the language of § 1 (7A). Both the employee and the insurer maintain that the defense under § 1 (7A) applies in cases of death occurring at the workplace. The issue is one of statutory construction.

"[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). "[T]he statutory language itself is the principal source of insight into the legislative purpose." *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). We "must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense." *Harvard Crimson, Inc.* v. *President & Fellows of Harvard College*, 445 Mass. 745, 749 (2006).

The board's analysis overlooks the workers' compensation statute (Act) as a whole, as well as the circumstances pursuant to which the defense under § 1 (7A) was enacted. Significantly, the Act contemplates compensation for both work-related deaths and personal injuries; it is not solely concerned with the latter. That a death is not specifically included in the definition of the term "personal injury" is inconsequential. An examination of the definition reveals that the term does not state what a "personal injury" actually is; rather, it includes and excludes only certain categories of personal injuries, and notably neither includes nor excludes a death.[12]

---

[12]Section 1 (7A) of G. L. c. 152 defines the term "personal injury" as follows:

" 'Personal injury' includes infectious or contagious diseases if the nature

"The various sentences of § 1 (7A) were adopted piecemeal over time . . . as a series of legislative responses to specific court decisions and perceived needs for targeted reform." *Cornetta's Case*, 68 Mass. App. Ct. 107, 114 (2007). In 1991, the Legislature inserted the third and fourth sentences of the definition of personal injury, setting forth the combination injury defense into the fourth sentence of the definition. See St. 1991, c. 398, § 14. The 1991 amendments to the Act "came in response to declining economic conditions and rising costs of workers' compensation insurance." *Taylor's Case*, 44 Mass. App. Ct. 495, 500-501 (1998).

Application of the combination injury defense pursuant to § 1 (7A) effectuates the Legislature's targeted reform by limiting compensation in certain cases where a noncompensable preexisting condition exists. The obvious concern was to withhold compensation in circumstances where a noncompensable, preexisting condition merely happens to manifest itself at the employee's workplace and has no relation to the employee's actual work. See *Maggelet's Case*, 228 Mass. 57, 61 (1917). This concern exists not only in circumstances where the noncompensable preexisting condition combines with a compensable injury or disease to result in personal injury, but also in cases where the combination injury results in death.

The insurer asserts that death cannot constitute an injury under the combination injury defense of § 1 (7A) and that, therefore, the employee's SCD can never be a compensable

of the employment is such that the hazard of contracting such diseases by an employee is inherent in the employment. 'Personal injury' shall not include any injury resulting from an employee's purely voluntary participation in any recreational activity, including but not limited to athletic events, parties, and picnics, even though the employer pays some or all of the cost thereof. Personal injuries shall include mental or emotional disabilities only where the predominant contributing cause of such disability is an event or series of events occurring within any employment. If a compensable injury or disease combines with a pre-existing [non-compensable condition] to cause or prolong disability or a need for treatment, the resultant condition shall be compensable only to the extent such compensable injury or disease remains a major but not necessarily predominant cause of disability or need for treatment. No mental or emotional disability arising principally out of a bona fide, personnel action including a transfer, promotion, demotion, or termination except such action which is the intentional infliction of emotional harm shall be deemed to be a personal injury within the meaning of this chapter."

injury. This interpretation would render § 7A superfluous. Further, the compensable injury is not the employee's death but rather, in this case, the ventricular arrhythmia or fibrillation (that resulted from either the polymorphic or monomorphic ventricular tachycardia). The employee's death was the ensuing disability. The expert medical evidence underscores this distinction. Dr. Patten explained (and his testimony in this regard was not contradicted) that a person experiencing ventricular fibrillation may, within a certain amount of time (measured in minutes), be "revived" or be "convert[ed] . . . back to a normal rhythm."[13] Thus, with these particular types of injuries, death may occur, but is by no means always certain, and as such, the occasion of death cannot be considered the injury under § 1 (7A).

Consideration of the effect of a preexisting condition in situations involving a work-related death is not inconsistent with § 7A. If a noncompensable preexisting condition does not exist, only § 7A will apply (if the employee's death occurred at the workplace), and the defense under § 1 (7A) will not be implicated.

When there is a noncompensable preexisting condition that combines with a compensable injury and results in a workplace death, application of the defense somewhat alters the insurer's burden of production in rebutting the prima facie evidentiary effect of § 7A. First, the insurer must present evidence that a noncompensable preexisting condition existed at the time of the employee's death. The production of this evidence, together with appropriate medical expert evidence on the issue of causation, would allow the insurer to argue that the employee's death was caused solely by the preexisting condition. Second, where an employee's workplace death does follow a combination injury (and the insurer does not argue that the death resulted solely from the noncompensable preexisting condition), the insurer will need to submit appropriate medical expert evidence that the compensable part of the combination injury (here, the ventricular arrhythmia or fibrillation) was not a major cause of the death, which includes a causal showing that the compensable

---

[13]During cross-examination, Dr. Pulde agreed that when a person goes into arrhythmia and progresses toward what would be SCD, the SCD may be aborted, and the person may survive, if there is an opportunity to provide cardiopulmonary resuscitation and to defibrillate the person within four minutes.

part of the combination injury was not brought on by the employee's work activities.[14] The employee, with whom the ultimate burden of production and persuasion lies, may respond by proffering appropriate expert medical evidence to contradict the evidence of the insurer. See *Viveiros's Case*, 53 Mass. App. Ct. 296, 299 (2001). For these reasons, the defense under § 1 (7A) and the prima facie evidentiary effect of § 7A are not mutually exclusive.

c. *Administrative judge's determinations under § 1 (7A).* We reject the insurer's contention that the administrative judge's decision does not sufficiently analyze the element of causation under § 1 (7A). The judge's extensive factual findings, supplemented with uncontested evidence from the record, provide the necessary factual predicate to support his conclusions, including his rejection of the insurer's defense under § 1 (7A).

The board incorrectly concluded that the defense under § 1 (7A) and the prima facie evidentiary effect of § 7A are mutually exclusive. Apart from making this erroneous conclusion, the board properly affirmed the administrative judge's decision. We therefore affirm the decision of the reviewing board, as so modified.

*So ordered.*

---

[14]This showing does amount to a heightened standard of causation, see *Castillo* v. *Cavicchio Greenhouses, Inc.*, 66 Mass. App. Ct. 218, 221 (2006), in comparison to that in § 7A. The standard, however, is to be used only in cases involving the combination injury defense under § 1 (7A), and is not used in a § 7A case where there is no evidence of a preexisting condition.